AO 106 (Rev. 04/10) Application for a Search Warrant

FILED

FEB 22 2018

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>(1) One Black LG, Model K371 Cellular Phone,<br>IMEI: 354885-07-680361-4 | )<br>)<br>)  Case No. **18MJ0830**<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein)

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963 | Importation of Methamphetamine; Conspiracy to Import Methamphetamine |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Esgate, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/22/18

*Judge's signature*

City and state: San Diego, California          Hon. Jan M. Adler, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963 is a black LG, Model K371 Cellular Phone, IMEI: 354885-07-680361-4 (the "Target Device").



The Target Device is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence and being held in the evidence vault at 880 Front Street, Suite 3200, San Diego, CA 92101.

## **ATTACHMENT B**

Authorization to search the Target Device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below. The seizure and search of the Target Device shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the Target Device will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 1, 2017 to November 16, 2017:

a. tending to identify attempts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>(1) One Black LG, Model K371 Cellular Phone, IMEI: 354885-07-680361-4. | **AFFIDAVIT OF SPECIAL AGENT RYAN ESGATE IN SUPPORT OF A SEARCH WARRANT** |

I, Special Agent Ryan Esgate, having been duly sworn, declare and state as follows:

## I
## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search (1) a Black LG, Model K371 cellular phone, IMEI: 354885-07-680361-4 (the "Target Device"), and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to Unlawfully Import a Controlled Substance (the "Target Offenses").

2. The Target Device was seized from Defendant Rodolfo Benito-Valencia ("Benito-Valencia") at the time of his arrest for Importation of Methamphetamine on November 16, 2017 at the San Ysidro Port of Entry. The Target Device is currently in the possession of Homeland Security Investigations as evidence and being held in the evidence vault at 880 Front Street, Suite 3200, San Diego, CA 92101.

3. This search of the Target Device supports an investigation and prosecution of Benito-Valencia for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the Target Device, as described in Attachment A, will produce evidence of the Target Offenses, as described in Attachment B.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

II

**AFFIANT'S EXPERIENCE AND TRAINING**

5. I am a Special Agent ("SA"), with the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by HSI as a Special Agent since February of 2006. As part of my training to become an HSI Special Agent, I attended courses at the Federal Law Enforcement Training Center ("FLETC"), where I received training on conducting federal criminal investigations, including, but not limited to, the gathering of evidence, preservation of a crime scene, and the use of electronic evidence. Prior to becoming an HSI Special Agent, I graduated from the University of California, Berkeley with a Baccalaureate degree in cognitive science.

6. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized

to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

7. I am currently assigned to HSI's Counter Proliferations Investigation ("CPI") group in San Diego, California, and investigate export violations related to items on the United States Munitions List and the commerce Control List. Prior to working in the CPI group, I worked in HSI's Narcotics group in San Ysidro, California, which primarily investigates violations of Title 21 of the United States Code along the Southwest border.

8. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, including methamphetamine, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

9. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular/mobile telephones, in part, because these individuals believe law enforcement is unable to track the phone numbers of calls placed to and from cellular/mobile telephones.

3

11. Based upon my training and experience as an HSI Special Agent, my participation in the investigation of narcotic organizations, and consultations with law enforcement officers experienced with narcotic trafficking investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

   a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, email, Internet, social networking websites, and voice messages.

   b. Drug smugglers believe that cellular telephones provide greater insulation and protection against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephone.

   c. Drug smugglers will use cellular telephones because they are able to monitor the progress of their illegal cargo while the conveyance is in transit.

   d. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations to facilitate the further distribution of their illegal cargo within the United States.

   e. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   f. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry within the United States.

   g. The use of cellular telephones by drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

    a. tending to identify attempts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled

5

substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

14. On November 16, 2017, at approximately 3:00 p.m., Rodolfo Benito-Valencia and his co-defendant, Erika Cruz ("Cruz"), applied for entry to the United States at the San Ysidro Port of Entry. Benito-Valencia and Cruz were riding together in a 2008 Dodge Caravan (the "Vehicle"). Cruz was driving the Vehicle, and Benito-Valencia was a passenger and the Vehicle's registered owner.

15. Customs and Border Protection Officer ("CBPO") Pittman and his Human/Narcotics Detection Dog ("HNDD") were conducting pre-primary roving operations during this time. During an exterior sniff of the Vehicle, CBPO Pittman's HNDD alerted to the undercarriage of the Vehicle near the spare tire holder. CBPO Pittman notified CBPO Flores of his HNDD's alert.

16. CBPO Flores approached the Vehicle's driver, Cruz, and asked where they were going. Cruz told him they were driving to Chula Vista, California. CBPO Flores asked for their entry documents and Cruz provided her United States Passport, and Benito-Valencia's Permanent Resident card. When asked, Cruz stated she had nothing to declare from Mexico. CBPO Flores asked Cruz the purpose of their trip to Mexico, and she told him their trip was to pick up the Vehicle after it had been repaired. Cruz told CBPO Flores that the Vehicle belonged to Benito-Valencia, who was a family friend. Benito-Valencia also gave a negative customs declaration. CBPO Flores referred the Vehicle to an area for secondary inspection.

6

17. In the secondary inspection area, the Vehicle was run through a Z-Portal X-Ray machine. CBPO Moreno reviewed the image of the Vehicle and noticed anomalies in the spare tire area. CBPO Willis then conducted a physical inspection of the Vehicle and discovered approximately seven (7) packages in the spare tire cover underneath the Vehicle. These packages weighed a total of 3.46 kilograms (7.6 pounds) and field-tested positive for the properties of methamphetamine. A second set of California license plates and a screwdriver were also found inside the Vehicle.

18. After Benito-Valencia and Cruz's arrest, I advised each of them regarding their *Miranda* rights and they both chose to make a statement. Cruz said the Vehicle belonged to Benito-Valencia. Cruz claimed that her nephew, Andres Salazar, assisted Benito-Valencia with purchasing the Vehicle. Cruz said that Andres Salazar had initially registered the Vehicle under Cruz's name, but she did not want it registered under her name. Cruz said she crossed into the United States with Benito-Valencia on a previous occasion so he could register the Vehicle under his name.

19. Cruz claimed to have crossed into the United States in the Vehicle with Benito-Valencia on four to five prior occasions. Cruz claimed that she drove Benito-Valencia to Mexico in the Vehicle on November 9, 2017.[1] She claimed that Benito-Valencia and the Vehicle remained in Mexico, but she returned to the United States on November 10, 2017 around 3:00 p.m. to work. Border crossing records indicate that Cruz crossed the Vehicle on three prior occasions, but only show that Benito-Valencia was present for one of them.

20. Cruz claimed Benito-Valencia contacted her on the day of their arrest to drive him across the border. Cruz stated that Benito-Valencia asked her to pick him up at a pharmacy near a taxi stand. She said this was unusual as she normally picked him up at his girlfriend's home. Benito-Valencia's girlfriend, Viviana Salazar, is also Cruz's cousin.

---

[1] As described below, it appears that Benito-Valencia has a residence in the United States, but also sometimes resides at the home of his "girlfriend," Viviana Salazar, in Mexico.

7

She said it was also unusual that Andres Salazar was present when she picked up Benito-Valencia. Cruz said she knew Andres Salazar to be involved in selling drugs, and knew he had been arrested for drug offenses in both Mexico and the United States. She further said she believed he was deported to Mexico after a drug-related arrest in San Diego, California.

21. Cruz stated she was going to cross into the United States with Benito-Valencia to purchase beauty supplies for Viviana Salazar and medication for Benito-Valencia. She then intended to drive back to Benito-Valencia's home.

22. Cruz said she overheard Andres Salazar talk with his sister, Koraima Salazar, about picking up money. She said she knows the Salazars do not work so she assumed any money they were picking up would be related to narcotics. When I advised Cruz that methamphetamine had been discovered in the Vehicle, she said she thought the Salazars only dealt with marijuana.

23. After interviewing Cruz, I interviewed Benito-Valencia. Benito-Valencia said Cruz was a family friend who was driving him to a CVS in Chula Vista, California. He planned for her to drive him to his home in Mexico after their errands.

24. Benito-Valencia claimed he had owned the Vehicle for approximately one month. He said he had crossed the Vehicle into the United States with Cruz approximately three to four times, and had crossed the Vehicle into the United States a total of four times. He claimed that he bought the Vehicle from a man he did not know. He said he sold this man some property in Mexico in exchange for the Vehicle and $12,000.00. Despite owning the Vehicle a month, Benito-Valencia said he was unaware that there were a second set of license plates inside it.

25. Benito-Valencia claimed to be in a romantic relationship with Viviana Salazar, who is thirty-seven years younger. He claimed that he has known Viviana Salazar since she was fourteen years old (i.e., twenty-three years). He also claimed to have known Cruz and Andres Salazar since they were young. He also said he knew that Andres Salazar had been deported from the United States for drugs. Despite his lengthy and close

relationship with Cruz and the Salazars, Benito-Valencia could not name Viviana Salazar's brother, who also lives with them at their home in Mexico.

26. The Target Device was discovered and seized by United States Customs and Border Protection at the time of Benito-Valencia's arrest. After Benito-Valencia's arrest, HSI assumed custody of the Target Device. Benito-Valencia claimed ownership of the Target Device.[2]

27. Based on my experience investigating narcotics smugglers, Benito-Valencia and/or Cruz may have used the Target Device to coordinate with their co-conspirators regarding the importation and delivery of the methamphetamine, and to otherwise further this conspiracy both inside and outside the United States. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Device. This data may include information that is relevant to the narcotics smuggling activities or Cruz and Benito-Valencia, including identifying identify other persons involved in their narcotics trafficking activities.

28. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. In this case, evidence supports probable cause to search the Target Device for information dating back to September 1, 2017. This is based upon a review of Cruz and Benito-Valencia's

---

[2] During the interview, an unsaved number called Benito-Valencia's number approximately six times in between 8:00 p.m. and 9:40 p.m. He claimed he did not know whose number this was and proposed that it could be the pharmacy at CVS calling him about his medicine. The caller did not leave any messages. This information is provided for purposes of full disclosure, but I ask the Court not to consider this information in making its probable cause determination whether to authorize the requested search and seizure warrant.

9

statements, and TECS records showing that Benito-Valencia began crossing the Vehicle into the United States in October 2017. Therefore, the date range for this search should be from September 1, 2017 to November 16, 2017.

## III

## **METHODOLOGY**

29. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

30. Following the issuance of this warrant, I will collect the Target Device and subject it to analysis. All forensic analysis of the data contained within the Target Device

and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

31. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV
## CONCLUSION

32. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Cruz and/or Benito-Valencia utilized the Target Device to facilitate the importation of methamphetamine (and conspiracy to do the same) in violation of Title 21, United States Code, Sections 952, 960, and 963.

33. Given the dates that Benito-Valencia claimed to have owned the Vehicle for approximately one month, probable cause exists to believe that evidence of the aforementioned offenses exists on the Target Devices for the period of September 1, 2017 to November 16, 2017. This will encompass the period during which Benito-Valencia owned the Vehicle, and any preliminary planning discussions about acquiring the Vehicle.

34. Because the Target Device was promptly seized during the investigation of Benito-Valencia's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by Benito-Valencia continues to exist on the Target Device.

35. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant

authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Ryan Esgate
Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this _____ day of February, 2018.

_____
HONORABLE JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

12